UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | No. 3:13-00077 |
| | ) | **Judge Sharp** |
| | ) | |
| **BRANDON T. TESSIER** | ) | |

## MEMORANDUM

Pending before the Court is Defendant Brandon T. Tessier's Motion to Suppress. (Docket No. 20). After the Court conducted an evidentiary hearing on the Motion, the parties were provided the opportunity to file supplemental briefing, and the issue presented has now been fully and extensively briefed. (Docket Nos. 20, 25, 32, 39, 56 & 60). For the reasons that follow, Defendant's Motion will be denied.

## I.

In conjunction with their post-hearing submissions, the parties filed Proposed Findings of Fact. Those proposed findings (Docket No. 54-1) are supported by the evidence received at the evidentiary hearing and are as follows:

In a one-count Indictment, Defendant was charged with knowingly possessing a computer and computer media that contained images and videos of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and 2252A(b). Those charges arose after a search of Defendant's residence on June 21, 2012.

The search was a part of "Operation Sonic Boom," a joint operation between the United States Marshal's Service, the Metro Nashville Police Department, and the Davidson County Probation Office.

1

During the three day operation, officers searched all residences of known sex offenders in Davidson County.

At the time of the search, Defendant was on probation for a September 2011 state conviction for possession of child pornography. Defendant was represented on those charges by Kevin James Griffith, an assistant in Nashville's Metro Public Defender's Office.

Mr. Griffith first met Defendant on September 7, 2011, at the "jail docket" in General Sessions Court. The prosecutor and Mr. Griffith were able to reach a plea agreement, whereby Defendant would receive a suspended six-year sentence and be placed on supervised probation for six years. It was also agreed that Defendant would serve a 90-day sentence on unrelated charges, after which point his probation period would begin.

Mr. Griffith testified that he likely reached the plea deal with the prosecutor in less than five minutes. There was no negotiation or discussion as to the terms or conditions of probation.

While many cases are resolved in the General Session Court during the "jail docket" proceedings, Defendant's case was a felony. Accordingly, the parties entered into a plea agreement for the Criminal Court's consideration, waived Defendant's right to a preliminary hearing and a grand jury indictment, and agreed to proceed in the Criminal Court on an information.

On September 30, 2011, Defendant appeared in the Criminal Court to enter his guilty plea. At that point, he received his conditions of probation. Those conditions were not bargained for and, according to Mr. Griffith, it is not a common practice in state criminal court for attorneys or the judge to discuss the conditions of probation with the defendant. Instead, the judge asks the probation department to speak with the defendant and review the probation materials.

Monica Corlew, an intake officer with the Tennessee Department of Corrections, was on duty

at the time of Defendant's guilty plea and likely prepared Defendant's probation order, but has no specific recollection of having done so. Ms. Corlew testified that, when an individual was sentenced to probation, her general practice was to interview the defendant, review the rules of probation with the defendant, and have him or her sign the probation order.

Ms. Corlew also testified that, on occasion, she would read the probation order to a defendant individually, while, on other occasions, she would read the probation order to a group of defendants. She also stated that sometimes she would read the probation order "word for word," and other times she would at least summarize the order and ask the defendant if he or she understood the terms. Ms. Corlew has no specific recollection of how she conveyed the terms of the probation order to Defendant.

Defendant, along with the sentencing judge, executed a "Probation Order," as well as "Special Probation Conditions for Sex Offenders," on September 30, 2011, that set forth the terms and conditions of Defendant's probation. So far as germane to the pending Motion to Suppress, the Probation Order provided:

> 6. I will allow my Probation Officer to visit my home, employment site, or elsewhere, will carry out all lawful instructions he or she gives, [and] will report to my Probation Officer as instructed. . . .
>
> 7. I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time.
>
> 12. If convicted of a sex offense, I will abide by the Specialized Probation Conditions for Sex Offenders as adopted by the Board of Probation and Parole.

(Docket No. 25-1 at 1). Defendant signed the Probation Order, immediately below bolded language that read: **"I have read or have had read to me the conditions of my Probation. I fully understand them and agree to comply with them."** (Id., emphasis in original).

3

The Specialized Probation Conditions contained several additional conditions, including the following:

> 1. I will not purchase or possess any pornographic or sexually explicit written, printed, photographed or recorded materials[ or] software. . . .
>
> 2. I will not obtain Internet access on any computer unless my Officer has given me written permission for Internet access. I will not utilize an electronic device for any sexually oriented purpose. I further consent to the search of any electronic device, software, or electronic data storage device at any time by my Officer.

(Docket no. 25-1 at 2). Defendant signed the Specialize Probation Conditions form immediately below the following bolded language:

> **I have read or have had read to me the above supervision instructions and fully understand them. . . . I understand that all instructions apply to me until my Officer and treatment provider, or the Court determines otherwise.**
>
> **I understand that if I do not agree with any condition, I have the right to petition the Sentencing Court for a modification. Any release from these instructions will be provided to me in writing.**

(Id. at 3, emphasis in original).

Several months into the probationary period, Garen Blanchard of the Tennessee Department of Corrections became Defendant's probation officer. Mr. Blanchard testified that, as is his custom with all defendants who come under his supervision, he went over the terms and conditions of Defendant's probation, as well as the specialized conditions relating to Defendant's status as a sex offender. Mr. Blanchard does not recall Defendant having any questions about the terms of his probation.

Shortly after 9:00 p.m. on June 21, 2012, Mr. Blanchard, Deputy Marshal Marty Magnon, and Metro Detectives Jason Mayo and Maria Sexton participated in the search of the apartment where Defendant lived with his mother and step-father, Edward Finn. Upon hearing a knock at the door, Mr.

Finn allowed the officers into the apartment. Once inside, Mr. Blanchard and Detective Sexton looked around the kitchen for probation violations, while Deputy Magnon and Detective Mayo went to Defendant's bedroom where he was sitting at the time.

At some point during the search, Deputy Magnon saw that Defendant had a cellphone and Defendant allowed Deputy Magnon to view it. Upon review, Deputy Magnon discovered some "questionable photos" on the phone.

At some point, officers also discovered a laptop, but there was a dispute as to where the laptop was located. Mr. Blanchard, who did not witness the laptop's discovery, recalled Deputy Magnon stating that it was found under a chair in the bedroom. Deputy Magnon testified that the officers noticed the laptop by the chair while searching the room. Detective Mayo, on the other hand, testified that the laptop was discovered when he lifted up an air mattress that was lying on the floor.

Having considered the conflicting testimony, the Court credits Detective Mayo's testimony that the laptop was found under the mattress in Defendant's room. It was Detective Mayo who lifted the mattress and memorialized that fact both in an incident report prepared the next day and in an offense report written several days later. Further, all of the officers who testified at the hearing stated that they had no reason to disbelieve Detective Mayo's account. Finally, Detective Michael Atkins, who works with Metro's child pornography unit, relied upon Detective Mayo's portrayal of the find when he later drafted a search warrant for the contents of the laptop.

After the laptop was discovered, Officer Mayo conducted a cursory search of the internet history and saw a website called "motherless.com." He called Detective Atkins, who had more experience with internet child pornography, and Detective Atkins told Detective Mayo that "motherless.com" was a website where both adult and child pornography could be found. Defendant

5

was read his Miranda rights and, after some questioning, was arrested.

## II.

The parties generally frame the pivotal issue in the Motion to Suppress to be whether the Fourth Amendment prohibits a suspicionless search of a probationer. Actually, the issue is a bit more narrow than that: Consistent with the Fourth Amendment, can a probationer who has been convicted of a felony and who has executed a probation order in which he "agree[s] to a search, without a warrant" be subjected to a search in the absence of reasonable suspicion? This question is yet unanswered by the United States Supreme Court or the Court of Appeals for the Sixth Circuit. However, cases from those courts as well as other circuit courts and the Tennessee Supreme Court provide guidance and lead this Court to answer the question in the affirmative.

### A.

In United States v. Knights, 534 U.S. 112 (2001), defendant was place on probation and subject to a probation order which required that he "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Id. at 114. He signed the probation order immediately below the following, bolded language: "**I HAVE RECEIVED A COPY, READ AND UNDERSTAND THE ABOVE TERMS AND CONDITIONS OF PROBATION AND AGREE TO ABIDE BY SAME.**" Id.

Recognizing that "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests,' Wyoming v. Houghton, 526 U.S. 295, 300, 119 S. Ct. 1297, 143

L. Ed.2d 408 (1999)," the Supreme Court "h[e]ld that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." Id. at 112-13 & 121. The Supreme Court also "h[e]ld that the warrantless search of [defendant], supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Id. at 122.

This case is analogous to Knights in that there, as here, Defendant signed a probation order that allowed for a search, even in the absence of a warrant. It differs, however, in that, there, unlike here, defendant "concede[d] that the search . . . was supported by reasonable suspicion." Id. In fact, the Supreme Court specifically passed on the issue presented in this case.[1]

Five years after Knights, the Supreme Court was presented with a California statue that provided that every prisoner eligible for release "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." Cal. Penal Code Ann. § 3067(a). Relying heavily on Knights, the Supreme Court in Samson v. California, 547 U.S. 843, 856 (2006) "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee in accordance with the statute.

In arriving at this conclusion, the Supreme Court stated that "[a]s we noted in Knights, parolees are on the 'continuum of state-imposed punishment'" and as in Knights, a "salient" consideration is

---

[1] The Supreme Court observed that it did not need to "decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent)" even though "[t]he terms of the probation condition permit such a search . . . because the search in this case was supported by reasonable suspicion." Id. at 120 n.6.

7

that by signing a search condition the parolee has a "significantly diminished . . . expectation of privacy." Id. at 850 & 852. Moreover, because "'parolees . . . are more likely to commit future criminal offenses,' Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 365 (1998)" the State's interests "are substantial" and "[a]s [was] made clear in Knights, the Fourth Amendment does not render the states powerless to address these concerns *effectively*." Id. at 850 (emphasis in original).

This case is similar to Samson in that, as a part of avoiding incarceration, Defendant entered into a written agreement that lessened his protections under the Fourth Amendment. It differs, however, in that Defendant was placed on probation (not parole), and the Supreme Court observed in Samson that, "[o]n th[e] continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." Id.

**B.**

As noted, the Sixth Circuit has not determined the precise issue in this case. In United States v. Herndon, 501 F.3d 683, 688 n.2 (6th Cir. 2007), a case involving the search of a probationer based on reasonable suspicion, the Sixth Circuit noted that Samson extended the totality of circumstances approach espoused in Knights, that "[i]t is not yet clear whether courts will apply Samson's sanction of warrantless and suspicionless searches to probationers as well as parolees," and that "[t]he Sixth Circuit has not considered the question."

However, and notwithstanding the fact that Knights was decided in the context of a case where reasonable susicion was found to exist, the Seventh Circuit concluded (in a pre- Samson case) that a probationer's blanket waiver of his Fourth Amendment right allows for a suspicionless search. And notwithstanding the existence of reasonable cause in Knights and the fact that Samson involved a parolee and not a probationer, the Ninth Circuit relied on those cases in determining that the Fourth

8

Amendment does not prohibit a suspicionless search of a violent felon where the probationer has accepted a suspicionless search condition as a part of a probation agreement.

**i.**

United States v. Barnett, 415 F.3d 690, 691 (7th Cir. 2005) presented the question "left open in" Knights about "the validity of a blanket waiver of Fourth Amendment rights as a condition of probation." There, defendant, as a part of being placed on "intensive supervision" in lieu of imprisonment "was required to 'submit to searches of [his] person, residence, papers, automobile and/or effects at any time such requests are made by the Probation Officer, and consent to the use of anything seized as evidence in Court proceedings.'" (Id. at 961).

In concluding that a blanket waiver allows a suspicionless search, the Seventh Circuit read Knights as holding that, given the existence of a signed waiver, the probation officer "need have *at most* a reasonable suspicion that the search will turn up contraband or evidence of crime. The Court's reasoning was that the waiver had diminished the probationer's expectation of privacy to a point at which he could not insist on a higher threshold, such as probable cause." Id. (emphasis in original).

The condition of probation in this case is not markedly different from that in Barnett. Both permit unannounced searches and contain no language that the search must be based on reasonable suspicion. Nevertheless, and as Defendant points out, Barnett is not controlling and, it was decided on a contract theory that has not been adopted by other circuits and has been subject to criticism. See, United States v. Baker, 2013 WL 4434955, at *6 n.10 (M.D. Ga. Aug. 14, 2013) ("No other circuit has adopted [Barnett's] theory"); David T. Reindl, BARGAINS OR UNCONSTITUTIONAL CONTRACTS?, 33 New England Journal on Criminal and Civil 123, 124 (Winter 2007) (in Barnett, "the Seventh Circuit Court of Appeals dubiously determined that reasonable suspicion is no longer a factor required

9

of searches when the individual being searched is on probation and where the prosecutor required the probationer to sign a form waiving his Fourth Amendment protections");

CRIMINAL PROCEDURE – FOURTH AMENDMENT – PROSPECTIVE BLANKET WAIVERS, 119 Harv. L. Rev. 1231, 1233 (Feb. 2006) (Barnett court "fai[ed] to respond authoritatively to [a] doctrinal puzzle" and "created the potential for confusion on the part of prosecutors, defendants, and lower courts").

Non-binding and criticized or not, Barnett makes a couple of valid, non-controversial points. First, constitutional rights can be waived, and "[i]t is well-settled that a person may waive his Fourth Amendment rights by consenting to a search." United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004) (citing Davis v. United States, 328 U.S. 582, 593-94, (1946)). Second, even though entering into a probation order allows the possibility of home searches, the alternative is likely imprisonment and constant surveillance, a far greater encroachment on Fourth Amendment rights. See Hudson v. Palmer, 468 U.S. 517, 525-26 (1987) ("[W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.").

**ii.**

United States v. King, 736 F.3d 805, 806 (9th Cir. 2013) presented the question of "whether the Fourth Amendment permits the suspicionless search of a probationer's residence." The Ninth Circuit "h[e]ld that such a search is permissible when, as here, a violent felon has accepted a suspicionless-search condition as part of a probation agreement." Id.[2]

---

[2] The court used "the term 'suspicionless search' to refer to a search for which the police have less than reasonable suspicion. That is, the term covers both a search as to which there is some (but not enough) suspicion and a search that is, for example conducted randomly with no individualized suspicion." Id. n.1.

King was subject to a probation agreement that "included the following term: 'Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer.'" Id. Relying heavily on Knights and Samson, the Ninth Circuit found its task to be "to examine the totality of the circumstances," and balance defendant's expectation of privacy against the State's various interests in deterring crime and protecting society. Id. at 808-09. The court struck that balance in favor of the State, but in doing so limited its holding:

> We need not decide whether the Fourth Amendment permits suspicionless searches of probationers who have *not* accepted a suspicionless-search condition, or of lower level offenders who have accepted a suspicionless-search condition, because those cases are not before us. Nor do we condone searches that are conducted for illegitimate reasons, such as harassment. We hold only that a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment.

Id. at 810 (emphasis in original).

Again, King is out-of-circuit authority. Defendant also argues it is distinguishable because "as a matter of state law, the search condition contained in King's probation agreement authorized suspicionless searches." (Docket No. 32 at 10).

In a footnote, the Ninth Circuit in King stated that "Defendant's agreement to the warrantless search condition as part of his state-court probation was an agreement to be subject to suspicionless searches," and cited state cases for the authority that a probation agreement "'that permits a search without a warrant also permits a search without reasonable cause.'" Id. at 807 n.9 (quoting, People v. Bravo, 738 P.2d 336, 343-43 (Cal. 1987)). However, the Tennessee Supreme Court in State v. Turner, 297 S.W.3d 155, 168 n.12 (Tenn. 2009) noted that, even though the standard language utilized in Tennessee "does not contain the language 'without cause' or 'without suspicion,'" this is "not

11

dispositive" because "[t]he point of the standard search condition used by Tennessee Board of Probation and Parole is to alert parolees that law enforcement officers will be able to search them without the usual necessity of first obtaining a judge's or magistrate's permission."

## C.

Having considered the foregoing authorities, and having reviewed many other cases as well, the Court concludes that the search in this case did not violate the Fourth Amendment. In the Court's opinion, this conclusion is a permissible extension of the analyses employed in Knights and Samson as applied in King.

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable." Griffin v. Wisconsin, 483 U.S. 868, 873 (1987). However, and as already noted, determining whether a search is reasonable requires an "examination of the totality of the circumstances" and requires "assessing, on the one had, the degree to which it intrudes upon an individual's privacy and, on the other hand the degree to which it is needed for the promotion of legitimate governmental interests." Houghton, 526 U.S. at 300.

Knights teaches that a defendant's "status as a probationer subject to a search condition informs both sides of that balance" because "[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" Knights, 534 U.S. at 119 (quoting Griffin, 483 U.S. at 874). Further, and just as in Knights, "[t]he judge who sentenced [Defendant] to probation determined that it was necessary to condition the probation on [his] acceptance of the search provision." Id. And, just as in Knights, "it is reasonable to conclude that the search condition would further the two primary goals of probation – rehabilitation and protecting society from future criminal violations." Id.

Defendant makes much of the fact that, unlike Knights, his probation order does not contain language about a search "with or without reasonable cause" and insists that the absence of such language means that a search could only be conducted based upon reasonable suspicion. After all, a search warrant requires "probable cause," and so, the argument goes, in the absence of a search warrant there must be reasonable suspicion. In the Court's view, this is too-cabined a reading of, "I agree to a search, without a warrant." Rather, and as the Tennessee Supreme Court in Turner held, a logical reading of that language is that no warrant will be required, not that, in its stead, reasonable suspicion is required. While Turner involved a parolee and, "[o]n th[e] continuum, parolees have fewer expectations of privacy than probationers," Samson, 585 U.S. at 856, the *point* the language is intended to make cannot be any different for probationers – the language informs them, as well, that judicial preview is not necessary before a search may occur. See, United States v. Downs, 199 WL 130786, at *2 & 4 n.2 (6th Cir. Jan. 19, 1999) (considering conditions of supervision in which defendant "agree[d] to a search without warrant of my person, my motor vehicle, or my place or residence by a probation/parole officer at any time," and finding "[t]he terms of the condition are readily understandable, making [defendant] aware of the potential warrantless search.").[3]

On the other side of the balance, the governmental interest is significant. In this regard, "it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" King, 534 U.S. at 120 (quoting, Griffin, 483 U.S. at 880). Not only is "[t]he recidivism rate of probationers . . . significantly higher than the

---

[3] In Turner, the Tennessee Supreme Court recommended that "the Board of Probation and Parole may wish to consider revising its standard conditions to reflect explicitly that parolees may be searched without either a warrant or any particularized suspicion." Id. This Court echoes that recommendation with regard to the standard conditions imposed on probationer so as to make explicit that which the Court finds to be implicit.

general crime rate," they "have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of or probation and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." Id.

Defendant was not convicted of a violent felony, as was the defendant in King. But he was convicted of sexual exploitation of a minor and the Government represents that he previously "was convicted of trafficking in child pornography by a military court." (Docket No. 25 at 1). Clearly, the State's interest in protecting its young is paramount, and "[c]hild pornography is, without qualification, a serious crime." United States v. Robinson, 669 F.3d 767, 776 (6th Cir. 2012); see also, United States v. Shultz, 733 F.3d 616, 620 (6th Cir. 2013) ("Congress saw a grave danger to public safety from known users of child pornography, beyond the danger posed by a run-of-the-mine felon.").

Further, the "dual concerns" of the State, as expressed in Knights, are present here as well: (1) "the hope that [defendant] will successfully complete probation and be integrated back into the community"; and (2) "the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community." Id. at 120-21. And, Samson's statement that "a state's ability to conduct suspicionless searches of parolees . . . aid, rather than hinders, the reintegration of parolees into productive society'. . . is true of probationer's as well." Turner, 736 F.3d at 809 (quoting Samson, 547 U.S. at 854).

### III.

For purposes of completion of the record, the Court addresses one final point raised by the Government in its response to Defendant's post-hearing brief. There, the Government argues that

14

"[e]ven if the Court concludes that reasonable suspicion is the appropriate standard for probationer searches, this search was in fact supported by reasonable suspicion" because, "[p]rior to conducting a full search . . . , an officer searched [Defendant's] cell phone, with his consent, and found what the officer described as 'questionable pictures' on the phone." (Docket No. 56 at 1). Later, the Government claims Defendant's cellphone contained "photos of children," and that find provided officers with "ample reasonable suspicion that [Defendant] possessed child pornography." (Id. at 10).

This is an overly-broad characterization of the record which the Court does not endorse.[4] The only testimony about discovery of the cellphone came from Marshal Magnon, and the entirety of his testimony on this score is as follows:

> Q . And did you -- tell us how the search went.
>
> A.  During the search [I] realized he had a cell phone. I had asked him to look at his cell phone. He gave me his cell phone, and I looked at his cell phone. We searched in his closet. We searched around the room. We noticed a laptop. He had a laptop in his room. And then I called Officer Blanchard in there and asked – told him about the computer, and he was talking to Mr. Tessier about the computer, why he had it.
>
> Q. Who called for Officer Blanchard to come in the room?
>
> A. I did.
>
> Q. Why?
>
> A. Because I noticed the computer by his chair, and I knew he wasn't supposed to have no computers by his chair. And, also, I saw some like questionable pictures on his cell phone, so I'd asked Officer Blanchard to come back there.
>
> Q. Where did you find the cell phone?

---

[4] The Court finds it appropriate to make this point given the likelihood of an appeal. This Court's opinion is based upon there being no showing of a reasonable suspicion for the search. The record developed by the Government simply does not support an alternative holding that there was reasonable suspicion to turn over the air mattress that led to discovery of the computer.

A. He handed me the cell phone. He had his cell phone, and I asked him if I could look at it. He gave me his cell phone.

(Docket No. 48, Hrg. Trans. at 80-81).[5]

Tellingly, Marshal Magnon never testified that the cell phone was found before the search under the mattress, or that discovery of the cellphone prompted a further search. Nor did he testify that the cell phone contained pictures of child pornography. Moreover, Mr. Blanchard testified that, during the three days of "Operation Sonic Boom," officer "looked under the mattress of just about everybody that we searched as well just because it's a pretty popular place to hide things," and Detective Mayo testified that "pretty much any time I was in a bedroom if a mattress hadn't been searched, I would search it," (Id. 56 & 63), suggesting that the cell phone had no impact on the officer's decision to search under the mattress.

## VI.

On the basis of the foregoing, Defendant's Motion to Suppress will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[5] Mr. Blanchard testified that when he went back to the bedroom, "there was a lot of things going on at once," and that he obtained the cell phone and looked through it as well. (Id. at 25). He did not testify as to when the cell phone was discovered, or what was on the cell phone. None of the other witnesses at the evidentiary hearing even mentioned the cell phone.